## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 17-Civ-22144-COOKE

SHKËLZEN BERISHA,

      Plaintiff,

  vs.

GUY LAWSON, EFRAIM DIVEROLI,
ALEXANDER PODRIZKI, DAVID
PACKOUZ, SIMON & SCHUSTER, INC.,
RECORDED BOOKS, INC., AND
INCARCERATED ENTERTAINMENT,
LLC,

      Defendants.

**PLAINTIFF SHKËLZEN BERISHA'S OPPOSITION TO DEFENDANTS' MOTION
TO STRIKE PLAINTIFF'S  EXPERT REPORTS AND PRECLUDE EXPERT
TESTIMONY UNDER *DAUBERT***

Plaintiff Shkëlzen Berisha ("Plaintiff"), pursuant to Rule 26 of the Federal Rules of Civil Procedure, Rule 702 of the Federal Rules of Evidence, and *Daubert v. Merrill Dow Pharm.*, 509 U.S. 579 (1993), respectfully submits this opposition to Defendants' Motion to Strike Plaintiff's Expert Reports and Preclude Expert Testimony Under Daubert (Dkt. No. 171; "Defs.' Mot.").

For the reasons set forth below, Defendants' motion to strike expert reports, exclude expert testimony, obtain translation costs, and their renewed motion to extend the expert discovery schedule, should be denied.

## PRELIMINARY STATEMENT

Before the Court are three expert disclosures: (1) that of Dr. Elizabeth Loftus (the "Loftus Report"), who may testify about scientific facts bearing on the reliability of a supposed eyewitness "identification" that is central to this case; (2) that of Dr. Christopher Anderson (the "Anderson Report"), who may testify regarding the number of persons who viewed certain internet articles related to Defendants' defamatory statements; and (3) that of Mr. Ivi Rexhepi (the "Rexhepi Report"), who may testify regarding the number of persons who viewed certain television broadcasts in Albania related to Defendants' defamatory statements.

Plaintiff's expert disclosures satisfy the requirements of Fed. R. Civ. P. 26(a)(2)(B). Namely, they were prepared and signed by the testifying witnesses, contain complete statements of the experts' opinions, cite the facts considered by the experts in forming those opinions, and set forth the experts' compensation and prior testimony.

Those disclosures also set forth opinions admissible under Fed. R. Evid. 702. That is, the opinions are based on sufficient data, reliable methods, and will assist the jury in determining facts in issue—*i.e.*, falsity (Dr. Loftus) and damages (Dr. Anderson and Mr. Rexhepi).

Defendants' motion, therefore, is unfounded. Lacking legal support to exclude Plaintiff's expert reports, Defendants rely on factual distortions and misstatements of law. Those misrepresentations are detailed herein.

Among many other sham contentions, Defendants feign "serious prejudice" in not being provided printed copies of publicly available websites, claim they don't know the identity of one of the experts (despite his signature on the report's cover), and argue (with no legal support) that Plaintiff was required to translate discovery materials for them.

## FACTS

**I.      PLAINTIFF'S EXPERT REPORTS**

### a.    The Loftus Report

<u>Related Background Facts</u>

Some of the defamatory statements in this case concern allegations of Plaintiff's involvement in a conspiracy to profit illicitly from a fraudulent arms-dealing scheme.  Those allegations derive from Plaintiff's alleged attendance at a May 2007 meeting (the "May 2007 Meeting") in which Alexander Podrizki ("Podrizki") and Efraim Diveroli ("Diveroli") attempted, on behalf of AEY, Inc. ("AEY"), to renegotiate ammunition prices with Ylli Pinari ("Pinari"), the chief executive of AEY's Albanian ammunition supplier.

Both Pinari and Diveroli deny that Plaintiff attended the May 2007 Meeting.  (*See* Zoladz Decl., Exs. A & B.)  In fact, Mr. Diveroli admits that the story of Plaintiff's attendance at that meeting was manufactured in order to silence a potential whistleblower (Kosta Trebicka).  (*See id.*, Ex. B.)  However, Mr. Podrizki still maintains that Plaintiff did, in fact, attend the meeting; although Podrizki has testified that Plaintiff was never introduced at that meeting and that Plaintiff remained completely silent.

Both the veracity of Podrizki's recollection, and the reliability of Podrizki's identification of the Plaintiff, are at issue in this case.  In a May 2008 interview of Podrizki, conducted by U.S. law enforcement, Podrizki was shown a photograph of the Plaintiff but could not identify him.  (*See id.*, Ex. C.)

Yet in October 2012, after Podrizki agreed to serve as a paid source for Guy Lawson's book, Lawson sent Podrizki an email with Plaintiff's first name in the subject line ("Shekel zen [sic] again") and asked: "Do you recognize the guy in this photo? From Albania obviously."  (*See id.*, Ex. D.).  Instead of attaching a photograph, Lawson's e-mail contained a link to an internet article about Plaintiff that (presumably) included a photo of Plaintiff.  (*See id.*)  Based upon Lawson's e-mail, Podrizki identified Plaintiff as an attendee of the May 2007 Meeting.  (*Id.*)

Further, although Podrizki insists that he remembers Plaintiff's face based upon Plaintiff's alleged silent attendance at a single meeting, Podrizki's deposition testimony shows that he does not recall many other details concerning the May 2007 Meeting.

<u>Elizabeth Loftus, Ph.D.</u>

Elizabeth Loftus earned a doctorate in Psychology from Stanford University, holds distinguished professorships in both Psychology and Cognitive Science, and is one of the nation's leading experts on memory.  Dr. Loftus has published 23 books and over 500 articles primarily regarding memory.  In 2004, she was elected to membership in the National Academy Sciences—one of the highest honors that a scientist can receive.

<u>Dr. Loftus' Opinions</u>

Dr. Loftus was "retained [] to review aspects of the case involving the memory of witnesses, and to offer opinions regarding the relevance of scientific research in the area of eyewitness memory to the facts of the case." (*See* Zoladz Decl., Ex. E at 1.)  To that end, Dr. Loftus "reviewed numerous documents in this case pertaining to the eyewitness accounts." (*See id.*)

As a result of that review, Dr. Loftus offered the following expert opinions (among others):

- "Contrary to what lay people believe, the act of remembering is not like a recording. Specific details are not imprinted into an eyewitness's memory.  Rather, scientific research reveals that the human memory system is far more complex and that memory is reconstructive and malleable.  Many studies show that lay people believe things to be true about memory that are contradicted by the scientific literature." (*Id.* at 2.)

- "[M]ost people realize that as time passes, memory fades and becomes less accurate. What is less a matter of common understanding is that as memory fades, it becomes more vulnerable to 'post-event information.'  A substantial body of scientific research illustrates that information a witness acquires after an event can influence and even distort what he/she later recalls about the original event." (*Id.* at 2.)

- "Between the time of the initial meeting in 2007 and the time when witnesses tried to identify who might have been at that meeting, many conversations and other post-event activities occurred.  These post-event activities may have influenced the memory of the witnesses, and could explain how one might go from not making an identification to later identifying that previously rejected person." (*Id.* at 2.)

- "I would be prepared to testify at trial about the workings of human memory, the effects of suggestion or inference on memory, the mechanisms of creation of false memories, and the characteristics of false memories." (*Id.* at 3.)

- "Another important factor in evaluating the accuracy of a person's recollection is the type of identification test that the witness is given. . . . There is a consensus amongst memory experts that line-ups produce more accurate outcomes than show-ups. . . . There is ample evidence that a "show-up" procedure was used to identify Mr. Berisha." (*Id.* at 3; internal citations omitted.)

- "I would be prepared to testify at trial that it is my opinion that the identification procedure used by Mr. Lawson to obtain the identification of Mr. Berisha, as an attendee

of the alleged May 2007 meeting, by Mr. Podrizki, was highly likely to produce a mistaken identification." (*Id.* at 3.)

Relevance of Dr. Loftus' Opinions to this Case

Under Florida law, one of the elements that a defamation plaintiff must prove is falsity of the defamatory allegations.  Dr. Loftus will assist the trier of fact in assessing the reliability and credibility of: (1) Podrizki's current recollection of Plaintiff's attendance at the May 2007 Meeting; (2) Podrizki's October 2012 e-mail-based "identification" of the Plaintiff; and (3) the influence that Podrizki's post-2007 interactions with Lawson may have had on Podrizki's recollections of Plaintiff's attendance.  As Podrizki is the only attendee of the May 2007 Meeting who maintains that Mr. Berisha was present, the reliability of Podrizki's testimony concerning the May 2007 Meeting is directly relevant to the falsity of the defamatory allegations.

### b.  The Anderson Report

Related Background Facts

In 2015, the New York Daily News (*see id.*, Ex. F), Rolling Stone Magazine (*see id.*, Ex. G) and other media outlets, reported that Lawson's book, *Arms and the Dudes: How Three Stoners from Miami Beach Became the Most Unlikely Gunrunners in History* (the "Dudes Book")—published in June 2015—was being made into a movie.  That movie, *War Dogs*, was released to theaters on August 19, 2016.

Lawson was paid for his work on the movie and both Simon & Schuster and Lawson encouraged cross-promotion of the film and the book (*see id.*, Exs. H-K).  To capitalize on the publicity associated with the film's release, in July 2016, Simon & Schuster, Inc. ("Simon & Schuster") and Lawson repackaged the Dudes Book under the title *War Dogs* and republished it. The cover of that "media tie-in" book, reproduced below, contains stylized photos of the lead actors in the film and claims that the book was "[t]he story that inspired the movie."

4



As a result, before the August 2016 movie release, many people assumed that the movie, like the Dudes Book itself, portrayed Plaintiff as a corrupt arms-dealer.  In fact, Gjergj Thanasi—one of Lawson's Albanian sources for the Dudes Book—in a March 25, 2016 e-mail bearing the subject "war dogs echo on Albanian media", sent Lawson a link to an article that discussed the upcoming film adaptation of the Dudes Book and quoted some of Lawson's allegations about Plaintiff.[1]  (*See* Zoladz Decl., Exs. L & Dkt. No. 172-30 (Browning Decl., Ex. BB).)  Similarly, many other media outlets discussed allegations of Plaintiff's involvement in corrupt arms-dealing in the context of reporting also on the then-impending release of the Dudes Book film adaptation.  (*See generally* Zoladz Decl., Ex. T.)

Ultimately, the movie did not portray—or even reference—the Plaintiff.  But the damage was done.  The Dudes' Book's defamatory allegations about Mr. Berisha were amplified by public/media interest in the film adaptation—interest upon which Lawson and Simon & Schuster capitalized.

Thus, Lawson's defamatory allegations about Plaintiff did not reach only those who purchased Lawson's books or witnessed Lawson's television and radio interviews.  Rather, Lawson's defamatory allegations about the Plaintiff were magnified in newspapers, internet articles, and television broadcasts reporting on the book and its film adaptation.

---

[1] Defendants disingenuously claim that article "concern[s] the Hollywood film, 'War Dogs'—not the Book" (Defs. Mot. at 8), despite that the article quotes Lawson's allegations about the Plaintiff, referring to Lawson as "the journalist whose investigation was the basis of the movie's screenplay focusing on Shkëlzen, the son of former Prime Minister Berisha" (*see* Dkt. No. 172-30 (Browning Decl., Ex. BB)).

<u>Christopher Anderson, Ph.D.</u>

Christopher Anderson earned his doctorate in Electrical Engineering from North Carolina State University.  He is a co-founder of Cyber Investigation Services ("CIS"), and the head of its Internet Reputation & Brand Group.  That group specializes in tracking, quantifying and mitigating defamatory information on the internet.

<u>Dr. Anderson's Opinions</u>

Dr. Anderson was engaged to locate "false materials spread online due to the publication of the book and subsequent movie" and offer an expert opinion "as to the number of people that likely saw this material online."  (*See* Zoladz Decl., Ex. M at 2.)

Based upon four search phrases—"Shkëlzen Berisha and War Dogs", "Shkëlzen Berisha and AEY", "Shkëlzen Berisha and Guy Lawson" and "Berisha shark-like eyes"—Dr. Anderson identified 81 website articles that he believed "had information that would [] tie Mr. Berisha to the Dudes Book or War Dogs Book." (*See id.* at 4.)  The internet addresses of <u>all</u> of those articles (with clickable, embedded hyperlinks) are listed in Anderson Report at pages 6 through 9.  (PDF representations of those websites were also attached as exhibits to his report.)

Dr. Anderson then offered his expert opinion as to the number of persons that likely viewed each individual article.  That is, based upon the number of visits to the domains hosting each article, average duration of exposure of the primary domain, and the click-through rate of each domain, Dr. Anderson estimated the number of views that each article received.  (*See id.* at 12-17.)  Notably, in calculating his estimates of the number of persons that viewed each article, Dr. Anderson took the "conservative view [] that the article is only exposed for one day" (*id.* at 12) despite that all of those articles remain available today.

<u>Relevance of Dr. Anderson's Opinions to this Case</u>

If Plaintiff chooses to offer one or more of the internet articles cited in Dr. Anderson's report as evidence of damage to reputation caused by the spread of Defendants' defamatory statements online, then Dr. Anderson's expert testimony concerning the number of persons that viewed those articles is relevant to the magnitude of that damage.

### c. The Rexhepi Report

<u>Related Background Facts</u>

In addition to the spread of Defendants' defamatory allegations via word of mouth, newspaper stories, internet articles, and sales of the books themselves, Defendants' defamatory allegations were covered in television news broadcasts.

Those broadcasts included, among other things, news coverage of politicians reading excerpts of the Dudes Book—including defamatory allegations about the Plaintiff—in sessions of the Albanian parliament, the allegations of the Dudes Book, and Lawson's interviews concerning the Plaintiff.

<u>Ivi Rexhepi</u>

Ivi Rexhepi is the Executive Director of Telemetrix, Sh.p.k. ("Telemetrix"). Telemetrix provides television audience measurement data (*i.e.*, ratings) for television broadcasts in Albania. Mr. Rexhepi earned a Bachelor's Degree in Psychology from the University of Tirana, and Master's Degree in Corporate Governance from the European University of Tirana. Prior to joining Telemetrix, Mr. Rexhepi spent several years working in the field of market research and opinion polling.

<u>Mr. Rexhepi's Opinions</u>

Mr. Rexhepi's report is a modest one. He was "hired to provide television audience measurement reports." (*See id.*, Ex. N at 2.) He does not purport to be an expert in defamation law, nor does he claim knowledge of the documents produced, and testimony elicited, during discovery. Rather, "[t]he objective of the report was confined to providing such [audience measurement data] reports solely for the specific dates that were specified." (*Id.* at 2.)

The Rexhepi Report explains how Telemetrix goes about collecting ratings data, including how the ratings households were selected (*see id.* at 2-3) and the technology that Telemetrix employs (*see id.* at 3-4). Telemetrix's audience panel was established "following strictly the solid methodology and standards of IDRA."[2] (*Id.* at 2.)

Mr. Rexhepi's report sets forth ratings data for individual news broadcasts. For example:

---

[2] IDRA Research & Consulting is "a leader in market research studies in Albania" (*id.*), "a member of ESOMAR—The World Association of Research Professionals [and] IDRA is certified with ISO Standard 2025-2012 on Market, Opinion and Social Research." (*See* Zoladz Decl., Ex. O at 3.)

| 18/5/2015 | | | | | | |
| Main Channels / Time Segment: 11:00 - 20:00 | | | | | | |
| Channel | Event | Genre | Avg Rating | Avg Share | Occurrences | Reach |
|---|---|---|---|---|---|---|
| Klan TV | NEWS (15:30) | News/Weather | 7.9202 | 26.4893 | 1 | 11.6732 |
| Klan TV | NEWS (12:00) | News/Weather | 4.7665 | 21.7315 | 1 | 7.0039 |
| Klan TV | NEWS (19:30) | News/Weather | 6.0571 | 17.9231 | 1 | 10.8949 |
| Top Channel | NEWS (15:00) | News/Weather | 8.6444 | 29.9094 | 1 | 11.284 |
| Top Channel | NEWS (12:00) | News/Weather | 3.0156 | 13.042 | 1 | 5.0584 |
| Top Channel | NEWS (17:30) | News/Weather | 2.179 | 6.7364 | 1 | 2.3346 |
| Vizion Plus | NEWS (19:00) | News/Weather | 5.5654 | 17.2453 | 1 | 8.9494 |
| Vizion Plus | NEWS (13:00) | News/Weather | 2.8071 | 11.3492 | 1 | 3.5019 |
| Vizion Plus | NEWS (15:00) | News/Weather | 2.6484 | 9.1684 | 1 | 3.5019 |

(*See id.* at 8.)  Row 5 of that chart indicates that, on May 18, 2015, the 12:00 news broadcast on Top Channel had an average rating of 3.0156, where "[o]ne rating point equals 1 (one) percentage and . . . represents approximately 3,130 families comprised of an average of 4 viewers."  (*See id.* at 5.)

Mr. Rexhepi's expert (albeit modest) opinion "is that the audience measurement data set forth in the Report is accurate, and that the data presented is based upon the research methodology set forth in the Report."  (*See id.*, Ex. N at 1.)

<u>Relevance of Mr. Rexhepi's Opinion</u>

If Plaintiff chooses to offer one or more of the news broadcasts referenced in Mr. Rexhepi's report as evidence of damage to reputation caused by the spread of Defendants' defamatory statements, then the audience measurement data presented by Mr. Rexhepi for those broadcasts is relevant to the magnitude of that damage.

## II.    DEFENDANTS' MISREPRESENTATIONS OF THE FACTS

Defendants' motion (Dkt. No. 171) is littered with misleading claims and outright lies concerning both Plaintiff's expert disclosures and the other facts related to the current dispute. Several of those misrepresentations are addressed immediately below, while others are confronted in the corresponding argument section.

**Misrepresentation #1:**  "Defendants were [] deprived of a meaningful opportunity to depose Plaintiff's experts because Plaintiff continued to produce supplemental information until the last day of expert discovery . . ."  (Defs.' Mot. at 3.)

Apart from additional information concerning the background of Mr. Rexhepi, Plaintiff did not produce <u>any</u> supplemental information concerning the three reports (*i.e.*, the Loftus Report, Anderson Report and Rexhepi Report) at issue in Defendants' motion.

The "supplemental information" identified by Defendants concerns an expert report that was withdrawn prior to the instant motion.  Nevertheless, Defendants chose to burden the Court with 137 pages of exhibits—*see* Browning Decl., Exs. A, F, H, I (pp. 7-22), J, K & GG—and several

pages of briefing, concerning a report that is not before the Court. Plaintiff's provision of additional information—requested by Defendants but not required to be produced—regarding a withdrawn report, cannot serve as justification for Defendants' failure to schedule depositions, or produce rebuttal reports, concerning three expert reports that were not supplemented.

Further, as noted in Plaintiff's Opposition to Defendants' Motion to Adjourn Dates and Extend Expert Discovery (*see* Dkt. No. 164 at 2-3), Defendants have known since mid-June (*see* Dkt. No. 87) that they were required to depose Plaintiff's expert witnesses during the 14-day period following August 15, 2018. Yet Defendants waited until August 23, 2018—eight days into that 14-day period—to raise <u>any</u> issue with Plaintiff's expert witness submissions and, even then, Defendants did not attempt to schedule a single deposition. Obviously, Defendants' lack of diligence is the reason that they did not have an opportunity to depose Dr. Loftus, Dr. Anderson and Mr. Rexhepi. Moreover, a cursory review of Plaintiff's experts' submissions (*see* Section I, *supra*) reveals that Defendants had adequate information to commence expert discovery. Thus, Defendants' tardy request for additional information does not justify their total inaction.[3]

> **Misrepresentation #2:** "Defendants were [] deprived of a meaningful opportunity to depose Plaintiff's experts because Plaintiff . . . refused to agree to any extension for taking depositions." (Defs.' Mot. at 3.)

Defendants contention is demonstrably false. On August 24, 2018, Plaintiff informed Defendants that he would consent to an extension of time for expert discovery on condition that such extension would allow Plaintiff additional time as well. (*See* Dkt. No. 160-8; McNamara Decl., Ex. 7.) In particular, Plaintiff proposed to submit <u>one</u> additional expert report (that of a journalism ethics expert). (*See id.*) Defendants refused that compromise and unilaterally moved the Court to extend the remaining discovery deadlines (*i.e.*, the deadlines for Defendants' expert submissions and depositions of Plaintiff's experts). (*See* Dkt. No. 160.) The Court denied Defendants' motion. (*See* Dkt. No. 165.) For the reasons set forth in Plaintiff's opposition to Defendants' initial motion to extend expert discovery (*see* Dkt. No. 164), and the additional reasons stated herein, the Court should also deny Defendants renewed motion to extend expert discovery.

> **Misrepresentation #3:** "Plaintiff's decision to withdraw one of his Albanian surveys on the deadline for Defendants to file its *Daubert* motion forced

---

[3] Defendants cannot contend plausibly that a lack of additional information on Mr. Rexhepi's background prevented them meaningfully participating in expert discovery, or taking Mr. Rexhepi's deposition. Mr. Rexhepi's academic and professional background was, and is, publicly available via LinkedIn: www.linkedin.com/in/ivi-rexhepi-71ba0a94. (*See* Zoladz Decl., Ex. P.)

[Defendants] to waste considerable time briefing unnecessary arguments that Plaintiff must have known to be moot."  (Defs.' Mot. at 3.)

Defendants did not inform Plaintiff that they were moving to exclude Plaintiff's expert reports until 7:23 p.m (EDT) on September 18th:

> "We have . . . concluded that all four of your expert reports are inadmissible under Rule 26 and the *Daubert* standard. . . .  Therefore, we will move tomorrow to exclude the reports under the Federal Rules of Civil Procedure and *Daubert* unless you voluntarily withdraw them.
>
> Please let us know if you intend to withdraw some or all of the reports.  I am available to discuss on the telephone tomorrow morning."

(See Zoladz Decl., Ex. Q.)  At 1:00 p.m. (EDT), on September 19th, Plaintiff responded:

> "Plaintiff hereby withdraws the report of Adlej Pici (Gfk Albania).  As such, your proposed motion to exclude his testimony is mooted.  Plaintiff, however, will oppose your motions to exclude the reports and testimony of Chris Anderson, Elizabeth Loftus and Ivi Rexhepi."

(*Id.*)  It is indeed audacious for Defendants to complain that Plaintiff waited until the Daubert motion deadline to withdraw a report, as Defendants waited until the eve of that deadline to inform Plaintiff that Defendants would move to exclude Plaintiff's reports.

> **Misrepresentation #4**:  Defendants notified Plaintiff on August 23, 2018 that 12 of the cited Exhibits were missing from the Report, which exhibits Plaintiff did not furnish to Defendants until September 7, 2018 . . . Plaintiff's failure to make complete expert disclosures with the necessary exhibits . . . seriously prejudiced Defendants.  (*See* Defs. Mot. at 4 (n. 2)-5.)

Defendants had access to <u>all</u> of the exhibits to the Anderson Report from the very moment they received it (*i.e.*, August 15, 2018).

The so-called 12 "missing" exhibits were printouts from "a list of 81 related URLs."  (*See* Zoladz Decl., Ex. M at 6.)  That is, Dr. Anderson's report contained a list of 81 clickable links to webpages.  (*See id.* at 6-9.)  For convenience, Dr. Anderson attached PDF printouts, showing the contents of those webpages, as exhibits.  Admittedly, some of those PDFs were missing from his initial report.  Yet Defendants had access to every single exhibit the entire time; they needed only to visit a link contained in Dr. Anderson's report to obtain a copy of a so-called "missing" exhibit.

> **Misrepresentation #5**:  "Dr. Anderson then estimated the readership or page views for each of the 81 articles, although [his report] does not explain how Dr.

Anderson arrived at those figures or the assumptions he made in doing so."
(Defs.' Mot. at 4.)

This is demonstrably false. As set forth above, Dr. Anderson estimated the number of views that each article received based upon the number of visits to the domains hosting each article, the average duration of exposure of the primary domain, and the click-through rate of each domain. (*See* Zoladz Decl., Ex. M at 12-17.) In terms of assumptions, Dr. Anderson noted that he took the "conservative view [] that [each] article is only exposed for one day" (*id.* at 12) despite that all of those articles remain available today.

If Defendants believed that they needed additional information from Dr. Anderson concerning his methodology, they should have timely noticed his deposition. If Defendants had a legitimate concern about Dr. Anderson's stated methodology, they could have hired an expert to evaluate Dr. Anderson's methods. Defendants, however, chose to do neither.

> **Misrepresentation #6:** "According to the Report, Dr. Anderson . . . identified 81 "hits" that allegedly contain damaging information about the Plaintiff that is **directly attributable to the Book**." (Defs. Mot. at 4; emphasis added.)

Defendants deliberately conflate two distinct issues concerning Dr. Anderson's work: (1) identification of articles potentially linking Plaintiff with Defendants' defamatory statements; and (2) Dr. Anderson's expert opinion regarding the number of persons that viewed each article.

Dr. Anderson did not offer an expert opinion on whether the articles contained information "directly attributable to the Book" nor could he. Rather, Mr. Anderson searched for articles that "tie Mr. Berisha to the Dudes Books or War Dogs Book" (Zoladz Decl., Ex. M, at p. 6) and offered an <u>expert</u> opinion on the number of persons that viewed each article (*see id.* at pp. 14-17).

If Plaintiff chooses to offer one or more of the internet articles cited in Dr. Anderson's report as evidence of damage to reputation, the trier of fact will determine whether such article reflects Defendants' defamatory statements. Dr. Anderson's expert testimony concerns only the number of persons that viewed such articles.

> **Misrepresentation #7:** "45 of the 81 articles (56%) concern the Hollywood film, "War Dogs"—not the Book. Many were published before the movie was released and before the movie tie-in version of the Book had been published, when the Book was not referred to as "War Dogs." (Defs.' Mot. at 8.)

Defendants claim that defamatory references to Plaintiff's involvement in corruption, made in the context of reporting on the movie "War Dogs," are not attributable to Defendants. That contention is false.

As noted above, the Hollywood film "War Dogs" did not portray—or even reference—the Plaintiff. But long before its August 19, 2016 theatrical release, media outlets reported that the "War Dogs" movie would be a film adaptation of the Dudes Book. (*See., e.g.*, Zoladz Decl., Exs. F & G.) In fact, Simon & Schuster and Lawson went to great lengths to ensure that the public understood that the "War Dogs" movie was based on the Dudes Book:

- **November 2015 (Lawson to Alexander Podrizki and David Packouz):** "The paperback is being delayed to 'tie in' with the movie . . . It's been moved from March to August. Apparently this is a good thing—trying to make a summer blockbuster." (*Id.*, Ex. H.)

- **May 2016 (Emily Graff ("Graff") of Simon & Schuster to Lawson):** "I know you've approved these already, but I wanted to bring up one more thing before I sent them to Warner Brothers. On both [book] jackets, it reads: NOW A MAJOR MOTION PICTURE." (*Id.*, Ex. J; emphasis in original.)

- **June 2016 (Graff to Lawson):** "We will be coordinating with the WB on marketing and publicity efforts . . . We'll be doing another push to encourage readers to discover 'the story that inspired the movie.' For marketing, we will promote on social media, continuously, linking to the trailer." (*Id.*, Ex. I.)

Further, in a March 2016 interview on Albanian television, Lawson said that the Dudes Book "inspired the production of a movie in Hollywood that will come out in the theatres in August and is produced by the producer of The Hangover." (*See* Dkt. No. 163.) In that same interview, Lawson stated:

> [T]he ex-prime-minister's son met with the Dudes when they were in Albania to arrange the delivery and repackaging of these munitions at a price that was, a, twice the price that the Albanian government was getting. . . . [T]he implication is clear that the prime minister's son, and perhaps even the prime minister, certainly the defense minister and other officials, were profiteers and the money was shipped off to a Cyprus holding company and then vanished.

(*Id.*)  After that interview, Albanian news media repeated a defamatory passage about Plaintiff from the Dudes Book and wrote that Lawson's investigation "was the basis of this movie's screenplay about Shkelzen, the son of former Prime Minister Berisha." (*See* Dkt. No. 172-30 (Browning Decl., Ex. BB).)

It is, therefore, obvious that references to Plaintiff, made in context of reporting on the movie, are evidence of the spread of Defendants' defamatory allegations. And the fact that many of

the articles "were published before the movie was released" (Defs. Mot. at 8) only supports that conclusion.

Defamatory references in those articles include:

- "Shkëlzen Berisha appears in another scene, and he has been mentioned as involved in the corrupt arms affair.  Shkëlzen is shown at an office, a man of few words, although he is the son of former Prime Minister Sali Berisha.  Shkëlzen is introduced as 'the father's son.'  Based on the movie, the Berisha family had the reputation of mafia families, similar to those in the south of Italy." (*See* Dkt. Nos. 172-33 & 172-34 (Browning Decl., Exs. EE & FF).)

- "Will the killer, Berisha and his son, watch the movie that Hollywood made for them?" (*See* Dkt. No. 172-18 (Browning Decl., Ex. P).)

- "This picture was taken a few days from the release of the movie about Gërdec, in which Zeni's role is mentioned." (*Id.*, Ex. M (*i.e.*, Anderson Report, Ex. 23) & Ex. T (translation).)

- "The other Albania, the one of Gërdec, the dirty and corrupt affairs, the Albania of mafias and political assassinations, the home of corruption, is represented by Shkëlzen, son of Sali, this bastard's son who is constantly irritating the Albanian people. Albania of Gërdec and 'War Dogs' against Albania of 'Chronicle in Stone.'" (*Id.*, Ex. M (*i.e.*, Anderson Report, Exs. 24, 65) & Ex. T (translations).)

Other articles reference defamatory allegations about Plaintiff, noting that the "War Dogs" movie was based on a "true story"—an indirect, but unmistakable, reference to the Dudes Book. (*Id.*, Ex. M (*i.e.*, Anderson Report, Exs. 6, 17, 18, 32, 38, 44, 46, 47, 49, 52, 53, 54, 61, 62, 66, 67, 70, 75) & Ex. T (translations).)

**Misrepresentation #8:**  "33 of the 81 articles (40%) report on a September 15, 2016 parliamentary debate. . . These articles . . . are irrelevant to the issues before the Court."  (Def. Mot. at 8.)

Again, Defendants would have the Court ignore the real-world factual context of those 33 articles.  Those articles show that, on the floor of parliament, Albanian politicians used the defamatory allegations about Plaintiff in the Dudes Book to attack Plaintiff's father as a "war dog." (*See* Zoladz Decl., Ex. M (*i.e.*, Anderson Report, Exs. 5, 12, 14, 15, 19, 21, 22, 34, 37, 42, 45, 55, 56, 59, 60, 64, 71, 72, 73, 81) & Ex. T (translations).)  In fact, as reported in one of those articles, a member of parliament was "shaking the 'War Dogs' book, which speaks about weapons trafficking" during parliamentary debate.  (*See* Dkt. No. 172-16 (Browning Decl., Ex. N).)  Obviously, those politicians were exploiting the public's assumption that the movie based upon the Dudes Book contained a defamatory portrayal of the Plaintiff.

**Misrepresentation #9**:  Defendants had to retain a translator who provided a summary of the Albanian articles annexed to Dr. Anderson's report, as well as certified translations of 19 of those articles.

As set forth in Argument Section IV, *infra*, Plaintiff was not required to translate the Albanian websites whose viewership was measured by Dr. Anderson.

Nonetheless, Defendants decision to translate only 19 articles, and "summarize" the rest, was a cynical, strategic decision, not the result of a lack of time or resources.  That is, Defendants decided to have their translator cherry-pick articles for translation that are more favorable to their argument, and then present a misleading summary of the remaining articles.

Attached hereto as Exhibit T to the Zoladz Decl., is a complete set of certified translations of the internet articles referenced in the Anderson Report that were not translated by Defendants. The "summary" of those articles presented by Defendants' translator is misleading for the reasons set forth above—that is, that "summary" ignores the factual context of those articles.

**Misrepresentation #10:**  The [Rexhepi] Report is so lacking in basic foundational information as to make it impossible to identify the purpose for which it was submitted . . ."  (Defs.' Mot. at 5.)

Defendants continue to feign a lack of understanding of Mr. Rexhepi's Report.  <u>First</u>, Defendants are well aware that Defendants' defamatory allegations have been reflected in numerous television broadcasts and, therefore, the purpose of the Rexhepi Report is to quantify viewership of those broadcasts.  <u>Second</u>, on August 28, 2018, in Plaintiff's Opposition to Defendants' Motion to Extend Expert Discovery, Plaintiff wrote:  "Telemetrix[] provided television audience measurement data (*i.e.*, ratings) for broadcasts that contain, or relate to, Defendants' defamatory statements."  (Dkt. No. 164, at p. 4.)

**Misrepresentation #11:**  "The [Telemetrix] Report also fails to designate a specific expert witness . . ."  (Defs. Mot. at 5.)

<u>First</u>, as required by Fed. R. Civ. P. 26, the report is signed—on its cover page—by the testifying witness.  (*See* Zoladz Decl., Ex. N.)  Moreover, the report notes that:  "Telemetrix **or myself** have not testified as witnesses or experts at any trial or deposition in the United States or elsewhere."  (*See id.* at p. 5; emphasis added.)

<u>Second</u>, if Defendants were ever actually confused as to the identity of the testifying witness, Plaintiff's opposition to Defendants' motion to extend expert discovery surely eliminated that supposed confusion.  (*See* Dkt. No. 164, at p. 4.)  In that opposition, Plaintiff wrote that the "reports

are signed by the testifying witness" and that "[e]ven if [] Rexhepi were unavailable for trial—for example, due to change of employment or illness—another agent of [] Telemetrix could be qualified to testify . . ." (*Id.*)

> **Misrepresentation #12:** "[T]he Loftus Report . . . fails to identify any expertise relevant to whether Lawson, a journalist, acted with actual malice." (Defs.' Mot. at 6.)

Defendants repeatedly (and deliberately) misstate the purpose of the Dr. Loftus' report. As set forth above, Dr. Loftus' testimony is not offered to show that Lawson acted negligently or recklessly (or otherwise failed to meet standards of responsible journalism). Rather, Dr. Loftus' testimony is offered to assist the jury in weighing the reliability of Mr. Podrizki's supposed recollection and identification of the Plaintiff as a silent attendee of the May 2007 Meeting.

It is plain on the face of her report that Dr. Loftus' proposed testimony concerns <u>actual falsity</u>, not the standard of care.

> **Misrepresentation #13:** "The Loftus Report also does not set forth Dr. Loftus' proposed direct testimony as it relates to this action . . ." (Defs. Mot. at 5.)

Defendants' assertion is plainly ridiculous; *see* Section I, under the subheading "Dr. Loftus' Opinions," above.

> **Misrepresentation #14:** "The Loftus Report must be rejected because it fails to offer a direct response to the question Dr. Loftus was engaged to answer, which is 'the fairness of the procedures used to elicit the identification of' Plaintiff from a photograph." (Defs. Mot. at 12.)

Defendants deliberately misrepresent the scope of the issues that Dr. Loftus was engaged to address. The Loftus Report states:

> "You retained me to review aspects of the case involving the memory of witnesses, and to offer opinions regarding the relevance of scientific research in the area of eyewitness memory to the facts of the case."

It is surprising that Defendants would attempt to mislead the Court regarding a matter so susceptible of ready proof.

# ARGUMENT

## I.   PLAINTIFF'S EXPERTS' DISCLOSURES COMPLIED WITH FED. R. CIV. P. 26

### a.   The Loftus Report Complies with Rule 26

Defendants claim that Dr. Loftus "fail[s] to offer a definitive opinion" because her report "says nothing about . . . whether Podrizki misidentified the photograph" and "[t]herefore, Dr. Loftus' expert conclusions will necessarily be a surprise to Defendants and must be rejected." (*See* Defs. Mot. at 12; internal quotations omitted.)  Defendants' contention fails for at least two reasons.

<u>First</u>, it is clear on the face of Dr. Loftus' report that her opinions will not "be a surprise." (*See* Zoladz Decl., Ex. E.)

<u>Second</u>, neither Rule 26 nor *Daubert* requires that Dr. Loftus conclude absolutely that Mr. Podrizki's recollection is false.  Rather, an "expert need not have an opinion on the ultimate question to be resolved by the trier of fact."  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718–19 (7th Cir. 2000).  "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert's* relevancy requirement."  *Id.*; *see also Perez v. City of Austin*, No. A-07-CA-044 AWA, 2008 WL 1990670, at *4 (W.D. Tex. May 5, 2008) (expert testimony "only needs to be relevant to the evaluation of a factual matter at issue in the case and helpful to the trier of fact").  Here, one of Dr. Loftus' opinions is that "the identification procedure used by Mr. Lawson to obtain the identification of Mr. Berisha, as an attendee of the alleged May 2007 meeting, by Mr. Podrizki, was highly likely to produce a mistaken identification." (*See* Zoladz Decl., Ex. E at 3.)  That opinion, among others, is relevant to a factual matter at issue in the case and helpful to the trier of fact.

### b.   The Rexhepi Report and Subsequent Letter Comply with Rule 26

For the reasons set forth above, Defendants' feigned lack of knowledge of the relevance of the Rexhepi Report and the identity of the testifying witness should be rejected.  Further, it is clear on the face of his report that Mr. Rexhepi adequately sets forth his opinions, the data that he considered, his compensation and prior testimony.

Admittedly, however, Mr. Rexhepi's initial report did not contain adequate information concerning his educational and professional qualifications.  Nevertheless, that information was, and is, publicly available on the internet, and was provided to Defendants via letter dated September 7, 2018. (*See* Zoladz Decl., Exs. P & R.)

Plaintiff's late disclosure of Mr. Rexhepi's educational and professional background did not prejudice Defendants. *See generally* <u>Higgs v. Costa Crociere S.p.A. Co.</u>, No. 15-60280-CIV, 2016 WL 4370012, at *4 (S.D. Fla. Jan. 12, 2016) (denying motion to exclude, under Rule 26, because "Plaintiff's late disclosure of [expert's] qualifications, experience and compensation [was] not unduly prejudicial to Defendant"). Defendants "had ample opportunity to depose [Mr. Rexhepi] if [they] wished, but did not attempt to do so." *See id.* Moreover, "Defendant[s'] ability to effectively prepare cross examination has not been significantly hampered by the delay." *See id.* Therefore, "the facts of this case do not warrant the exclusion of [] testimony on Rule 26 grounds." *See id.*

## II.     PLAINTIFF'S EXPERTS' TESTIMONY IS RELEVANT

### a.   The Loftus Report is Relevant

Defendants argue that the Loftus Report is irrelevant "because it reveals nothing about standards for responsible journalism." (Defs. Mot. 16-17.) Yet Dr. Loftus' testimony is not offered to address the standard of care. Instead, Dr. Loftus' testimony is offered to assist the jury in weighing the reliability of Mr. Podrizki's supposed recollection and identification of the Plaintiff as an attendee of the May 2007 Meeting.

### b.   The Rexhepi Report is Relevant

Mr. Rexhepi was engaged "to provide television audience measurement reports." (*See* Zoladz Decl., Ex. N at 2.) His analysis "was confined to providing such [audience measurement data] reports solely for the specific dates that were specified." (*Id.*) Defendants object to his report because of its supposed failure to express "any opinion explaining why this data is relevant to this defamation action." (Defs.' Mot. at 11.) But Mr. Rexhepi was not required to offer an opinion on the relevance of the ratings data to this defamation action. Moreover, Defendants are well-aware that their defamatory allegations have been covered in various news broadcasts.

As noted above, "[e]xpert testimony need not relate directly to the ultimate issue in a particular case." *Perez v. City of Austin*, No. A-07-CA-044 AWA, 2008 WL 1990670, at *4 (W.D. Tex. May 5, 2008). "It only needs to be relevant to the evaluation of a factual matter at issue in the case and helpful to the trier of fact." *Id.* In this case, if Plaintiff chooses to offer one or more of the news broadcasts referenced in Mr. Rexhepi's report as evidence of damage to reputation, then the Rexhepi Report will assist the trier of fact in evaluating the magnitude of the damage.

### c.  The Anderson Report is Relevant

Defendants argue the that internet articles referenced in Dr. Anderson's report "do not say what he contends they do" and therefore his "conclusions are . . . [not] relevant to any issue before the Court." (Defs. Mot. at 14.)  Yet, as detailed above, Defendants' characterization of those articles is factually inaccurate.  And, in any event, Dr. Anderson's expert opinion concerns the number of persons that saw those internet articles, not whether those articles are tied sufficiently to Defendants' defamatory statements.

As set out above, if Plaintiff chooses to offer one or more of the internet articles cited in Dr. Anderson's report as evidence of damage to reputation caused by the spread of Defendants' defamatory statements, then Dr. Anderson's expert testimony concerning the number of persons that viewed those articles is relevant to the magnitude of that damage.  In this case, the trier of fact can determine whether any given article references Defendants' defamatory statements.

## III.   DEFENDANTS' COMPLAINTS ABOUT DR. ANDERSON'S AND MR. REXHEPI'S METHODOLGIES ARE BASED UPON MISREPRESENTATIONS OF THEIR DISCLOSURES

Regarding the Anderson Report, Defendants contend wrongly that:

> "[H]is report fails to even describe what his statistical methodology is.  As such, it is not possible to conclude that Plaintiff's [sic] overreaching and highly generalized conclusions are reliable . . ."

(Defs. Mot. at 14).  Dr. Anderson explicitly describes his methodology in the report.  (*See* Zoladz Decl., Ex. M at 12-17.)  Specifically, Dr. Anderson estimated the number of views that each article received based upon the number of visits to the domains hosting each article, average duration of exposure of the primary domain, and the click-through rate of each domain.  (*See id.* at 12-17.)

With respect to the Rexhepi Report, Defendants assert incorrectly that:

> "[Mr. Rexhepi] has not even begun to explain why [his] expert testimony is credible and fails to show that [his] methodology . . . is reliable."

(Defs. Mot. at 15.)  First, regarding the representativeness of its audience panel, the Rexhepi Report states that:

> "The [establishment] survey consisted of the interviewing of 3000 households all over Albania, both urban and rural, **following strictly the solid methodology and standards of IDRA** to achieve nation-wide representativeness. . . . [T]he panel recruitment process was based on the following Household characteristics:

- Household Structure - Wealth Index - TV Platforms under use - Geographical Location

(Zoladz Decl., Ex. N; emphasis added.)  IDRA is member of the European Association of Opinion and Marketing Research Professionals (ESOMAR).  (*See id.*, Ex. O.)  That is, the establishment survey methodology aligns with that employed by other firms in the field.

Second, Mr. Rexhepi details the technology used to gather the data presented in the report. (*See id.*, Ex. N at 3-4.)

Third, audience measurement data (*i.e.*, ratings) has been admitted into evidence by federal courts on many occasions.  *See, e.g., Mar. Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.*, 310 F. Supp. 2d 786, 797 (N.D. Tex. 2003) (noting admission of Nielsen ratings), *aff'd sub nom. Mar. Madness Athletic Ass'n LLC v. Netfire Inc.*, 120 F. App'x 540 (5th Cir. 2005).  And the methodology used by Telemetrix, is substantially similar to that employed by Nielsen.  (*Compare* Zoladz Decl., Ex. N *with* Ex. S.)

## IV.  PLAINTIFF WAS NOT REQUIRED TO TRANSLATE THE WEBPAGES REFERENCED IN THE ANDERSON REPORT

Defendants cite several cases, and "Rule 2N of this Court's Civil Filing Requirements" for the supposed requirement that an expert must translate all documents referenced in his report.  (*See* Defs. Mot. at 17-18.)  Yet none of the authorities cited by Defendants stand for that proposition.  In fact, all of the authorities cited by Defendants concern the requirement that documents actually filed with the court must be translated into English.[4]

Defendants do not cite a single case or local rule, and Plaintiff is aware of none, that support the proposition that an expert must translate documents referenced in his report.  Such lack of authority stands to reason; the general rule in discovery is that the producing party has no obligation to translate documents for the opposing party.  *See Jaffe v. Bank of Am., N.A.*, No. 07-21093-CIV, 2008 WL 11333255, at *1 (S.D. Fla. Apr. 29, 2008) ("ABC can hardly be criticized for delivering documents in their original language.").  Until a document is filed with the Court, it makes little sense to undergo the expense of translation.  *See In re Fialuridine (FIAU) Prod. Liab. Litig.*, 163 F.R.D.

---

[4] Defendants' reliance on Rule 2N of the Civil Filing Requirements is particularly ill-conceived as Local Rule 26.1B states:  "**Initial and expert disclosures** and the following discovery requests, responses, objections, notices or any associated proof of service **shall not be filed until they are used** in the proceeding or the court orders their filing . . ." (emphasis added).

386, 388 (D.D.C. 1995) ("To be sure, before plaintiffs could use any of the documents in this litigation, they must be formally translated.  However, not all the documents may be used.")

Defendants request that "the Court order Plaintiff to reimburse Defendants for the costs of translating portions of Plaintiff's expert reports" (Defs. Mot. at 18) is equally misguided.  The law is clear that "the Federal Rules do not confer upon the district court the power to require payment of translation expenses at the pretrial stage."  *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 103 F.R.D. 357, 358 (D.D.C. 1984); *Anazonwu v. Nissan N. Am., Inc.*, No. 3:05CV147/MCR/EMT, 2006 WL 6035749, at *1 (N.D. Fla. June 26, 2006).  Rather, those expenses may be sought if Defendants succeed on the merits.  *See, e.g., D&M Carriers, LLC v. Spirit*, No. 11-80722-CIV, 2013 WL 12095541, at *4 (S.D. Fla. Oct. 17, 2013).

What's more, Defendants' complaint about Plaintiff's supposed failure to translate exhibits is hypocritical.  In support of Defendants' motion for summary judgment, Defendants filed a 98-page exhibit in Albanian without an accompanying translation.  (*See* Dkt. Nos. 133 (McNamara Decl.) & 133-5 (Exhibit 72) (At ¶ 6: "Annexed hereto as Exhibit 72 is a true and correct copy of a list of the news articles responsive to the search term 'Shkëlzen Berisha' that are hosted on the online archive of the Albanian newspaper Gazeta Dita.").)

Finally, prior to filing their motion, Defendants did not request translation of a single exhibit to the Anderson report.  If Defendants truly believed that they were to be "prejudiced" by the Albanian-language internet articles, they would have raised the issue before now. [5]  Instead, their complaint about translation should be seen for what it is—an attempt to avoid the Court's prior decision denying an extension of time to conduct expert discovery.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully submits that Defendants' motion to strike expert reports, exclude expert testimony, obtain translation costs, and their renewed motion to extend the expert discovery schedule, should be denied.

---

[5] In any event: (1) Defendants' translator has reviewed all of the exhibits to the Anderson Report; and (2) Plaintiff has attached certified translations of the remaining exhibits to this opposition memorandum (*see* Zoladz Decl., Ex. T).

October 3, 2018                                    Respectfully Submitted,


                                                  /s/ Jason M. Zoladz

                                                  Jason M. Zoladz
                                                  *Admitted pro hac vice*
                                                  New York State Bar No. 4250593
                                                  California State Bar No. 237921
                                                  1450 2nd Street
                                                  Santa Monica, California 90401
                                                  Tel: (347) 851-7141
                                                  jason@zoladzlaw.com

                                                  Jeffrey W. Gutchess
                                                  Florida State Bar No. 702641
                                                  Brandon P. Rose
                                                  Florida State Bar No. 99984
                                                  AXS LAW GROUP, PLLC
                                                  2121 NW 2nd Avenue, Suite 201
                                                  Wynwood, Florida 33127
                                                  Tel: (305) 297-1878
                                                  jeff@axslawgroup.com
                                                  brandon@axslawgroup.com


                                                  *Attorneys for Plaintiff Shkëlzen Berisha*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that, on October 3, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing via electronic mail to all attorneys of record.

/s/ Brandon P. Rose
*Attorney for Plaintiff Shkëlzen Berisha*